446

## ELASTIC STOP NUT CORP. v. UNITED STATES.

No. 48986.

United States Court of Claims.

July 13, 1953.

Hamilton Hicks, New York City, for plaintiff.

Martin E. Rendelman, New York City, with whom was Warren E. Burger, Asst. Atty. Gen., for defendant. Paris T. Houston, Washington, D. C., and Martin E. Rendelman, New York City, were on the briefs.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

MADDEN, Judge.

The plaintiff sues for $166,911.33 which, it claims, is the amount which it expended above the amount which it was paid for the manufacture, for the Government, of shell fuzes. By order of the court, the instant phase of the suit is limited to the question of liability, leaving to further proceedings the amount which the plaintiff may recover, if the Government is liable.

The plaintiff corporation's principal place of business is at Union, New Jersey. Its principal business is the manufacture of a self-locking nut, known as the "elastic stop nut." It has a factory at Union, and another one at Lincoln, Nebraska. Until the middle of 1944 its factories and facilities were engaged in the manufacture of these nuts, principally for airplane manufacturers and for the Army and the Navy. In the summer of 1944 orders for the elastic stop nuts decreased and the plaintiff sought contracts with the Government for the manufacture of other things. It was given a contract, No. 1932, for the manufacture of 1,011,000 shell fuzes, at the unit price of $1.58 each, to be manufactured at its New Jersey plant, under the supervision of the Army's New York Ordinance District. At the same time it was given another contract, No. 828, for the same number of fuzes at the same price at its Lincoln, Nebraska, plant. The instant claim arises out of Contract No. 1932.

Article 33 of the contract, which is set out verbatim in the findings, stated that the parties recognized that the unit price of $1.58 set in the contract might turn out, upon experience, to be too high or too low, and that they therefore agreed to revise the price in the light of actual experience in the manufacture of the first 40% of the total number of fuzes, which they called the "trial run." The contractor was to keep a careful record of its costs and furnish to the Government within 30 days after the

completion of the trial run its data and its proposal for a revised price. The parties were, thereupon, to negotiate in good faith and attempt to reach an agreement upon a revised price. If they could not agree, either party might then terminate the contract, and in that case the provisions of Article 12, "Termination at the Option of the Government" were to apply, except that the contractor was to be allowed no profit on the uncompleted portion of the contract. Article 12 provided, in substance, that the contractor should, upon termination, be reimbursed for its costs.

After the execution of Contract No. 1932, the plaintiff acquired the necessary machinery and tools for its performance, and began the manufacture of fuzes at its New Jersey plant and did the same, under Contract No. 828 at its Nebraska plant. By December 1944, it had learned that it could manufacture the fuzes more efficiently and at lower cost at its Nebraska plant. Besides, the demand for elastic stop nuts had revived, and practically all of these were being made at the New Jersey plant. The plaintiff after discussions with representatives of the Ordnance Department, made a written request on January 1, 1945, for permission to manufacture the fuzes under Contract No. 1932 at its Nebraska plant. The request was granted. The plaintiff was notified on January 11 that Contract No. 1932 had been transferred for administration from the New York to the St. Louis Ordnance District. The St. Louis District was directed to administer the contract from the date of transfer "including any price redetermination under Article 33 * * *." The plaintiff had already pursuant to the preliminary discussions, shipped machinery from New Jersey to Nebraska.

Before the contract was transferred, a number of change orders concerning Contract No. 1932 had been issued but the amounts due the plaintiff under them and other details had not been worked out. The St. Louis District said that it would be confusing to administer these matters from the St. Louis office, when the data concerning them were in the New York District. The St. Louis District suggested that Contract No. 1932 be returned to the New York District, and be there terminated at a quantity of fuzes which would use up the parts in process, and that a new contract be made by the St. Louis District for the production of the uncompleted balance of the fuzes, they to be manufactured at the Nebraska plant. A meeting of the parties took place in Washington, D. C., and the problem was discussed. The plaintiff's representative at the meeting inquired whether the plaintiff would lose its rights under Contract No. 1932 if the suggested procedure was followed. It was agreed by all present that the rights and obligations of the parties would be the same as they would have been if the transfer of Contract No. 1932 to St. Louis had not been rescinded. The plaintiff thereupon agreed to the suggested procedure.

After negotiations with the plaintiff, the St. Louis Ordnance District issued a "letter order" designated as Contract No. 1523, dated January 31, 1945, for 2,429,000 fuzes, subsequently reduced to 1,001,600 fuzes, at prices to be subsequently agreed on. At the same time a change order was issued accelerating the production of the fuzes then being manufactured at the Nebraska plant under Contract No. 828.

On February 21, 1945, the plaintiff wrote the New York Ordnance District as follows:

"* * * we are willing to accept cancellation of Contract No. * * * 1932 contingent upon February production and delivered and accepted fuzes. The remaining undelivered quantity upon which we accept cancellation is 931,000 pieces.

"This cancellation will be accepted without termination charge with the complete understanding that all other provisions as outline in Contract No. * * * 1932 remain in full effect."

On February 22, the New York Ordnance District sent to the plaintiff a notice of the partial termination, for the convenience of the Government, of Contract No. 1932, which said that the contract was terminated as to all but 80,000 fuzes, and was further terminated as to any of the 80,000 fuzes.

not completed on February 28. The notice contained a paragraph 6(b) which said:

"* * * (b) If you wish to waive any termination claim against the Government, please sign and return all three copies of the inclosed "No-Cost" Prime Contract Settlement Agreement. One copy signed by the Contracting Officer will be returned for your files."

The notice of termination was accompanied by a form of document entitled "Acknowledgment of Notice and Intent To File or Not To File a Claim", and by a draft of a proposed "Supplemental Agreement No. 5 to Contract * * * 1932." The draft said, *inter alia*:

"* * * Whereas, the Contractor is willing to waive unconditionally any claim against the Government by reason of such termination; and

"Whereas, such unconditional waiver by the Contractor will expedite settlement of the Contract and will otherwise promote the objectives of the Contract Settlement Act of 1944.

"Now, therefore, the parties hereto agree as follows:

"Article 1. The Contractor hereby unconditionally waives any claim against the Government arising under the terminated portion of the Contract or by reason of its termination including, without limitation, all obligations of the Government to make further payments or to carry out other undertakings in connection with said terminated portion, and the Government hereby unconditionally releases the Contractor from any obligation to perform further work or services or to make further deliveries of articles or materials under the terminated portion of the Contract; provided however, that nothing herein contained shall impair or affect in any way any other covenants, terms, or conditions of the Contract."

Upon receiving the proposed agreement the plaintiff's representative was in doubt as to whether it reserved the plaintiff's rights to file claims arising out of the untermi-nated portion of the contract calling for 80,000 fuzes. He telephoned Mr. Ferguson, the Government's Chief of Terminations, asking him what the proposed Supplemental Agreement meant in that regard. Mr. Ferguson told him that the proviso at the end of the language quoted above reserved the plaintiff's rights arising under the uncanceled portions of the contract. The plaintiff thereupon signed the Supplemental Agreement and the waiver of a termination claim. It continued to manufacture fuzes until February 28 by which date it had completed 54,250 fuzes.

On August 2, 1945, the plaintiff filed a claim with the New York Ordnance District for its costs in executing Contract No. 1932 up to the point of its termination, less the $1.58 per fuze which it had been paid for the 54,250 fuzes completed. The claim was rejected by the contracting officer on the ground that the Supplemental Agreement which the plaintiff had executed constituted a no-cost settlement agreement. Nevertheless the Government caused its auditors to make an accounting review of the plaintiff's claim, and their audit showed that the plaintiff's costs exceeded by $231,-493.90 what it had been paid. Though these costs were incured at the New Jersey plant, the Government's auditors allocated them between Contract No. 1932 and Contract No. 828, the contract which was to be performed at the Nebraska plant, and the Government paid the plaintiff $64,582.57, the amount which its auditors allocated to Contract No. 828. The Board of Awards of the St. Louis Ordnance District said, of the amount so allocated to Contract No. 828:

"These costs represent 'starting load' and manufacturing costs allocable to components manufactured at the Union, New Jersey, plant and shipped to Lincoln, Nebr., for use in the performance of Contract * * * 828."

The plaintiff, in addition to the 54,250 fuzes which it had completed in New Jersey, had manufactured parts of fuzes there which it had shipped to its Nebraska plant where they were incorporated in completed fuzes. Those parts were the basis of the allocation made by the Government's au-

ditors. The same type of starting load costs were found by the auditors to be applicable to the 54,250 fuzes completed at the New Jersey plant, but the St. Louis officials could not pay those costs because they never came, even colorably, within their jurisdiction.

The plaintiff's claim having been denied by the New York Ordnance District, the plaintiff appealed to the Appeal Board, Office of Contract Settlement. The Appeal Board decided that the plaintiff had not, by the Supplemental Agreement, waived the rights which it would have had if Contract No. 1932 had been shifted to the Nebraska plant, instead of being terminated. Therefore, the plaintiff was entitled, assuming that it was not in default, to the benefits of Article 12 of the contract. But, the Board held, under Article 12 the contractor has no right, which the Board could enforce, to a price revision. It held that a price revision, in that situation, lay entirely in the discretion of the contracting agency.

■ We think that the Board overlooked, or failed to see the significance of Article 12(f) of Contract No. 1932. It says, in regard to termination of the contract by the Government, which occurred in the instant case:

"* * * (f) In the event that, prior to the determination of the final amount to be paid to the Contractor as in this Article provided, the Contractor shall file with the Contracting Officer a request in writing that an equitable adjustment should be made in the price or prices specified in the contract for the work not terminated by the Notice of Termination the appropriate fair and reasonable adjustment shall be made in such price or prices. * * *"

We think that the contractor was entitled to such an adjustment as of right, and was not merely dependent upon the grace of the contracting officer as to whether he should receive it or not. The other provisions of Article 12 furnish a sufficient guide as to the basis for such an adjustment, so that a court is not merely acting at large in making the adjustment when the contracting officer has refused or neglected to make it. The Government's own auditors seem to have had no difficulty in determining the elements to be considered. Those elements are, as we understand them, the costs, computed by proper accounting methods, and reasonably incurred. The plaintiff is claiming no profit.

■ The documents out of which the plaintiff's rights must be culled are verbose and complicated Government writings. It was not remarkable that the plaintiff's representative asked the Government's Chief of Terminations what they meant, and relied upon his answer. That answer was in accord with what had been agreed upon in the discussions which preceded the reduction of the supplemental agreement to writing. There was no reason why the plaintiff would have been willing, or why the Government would have wanted the plaintiff, to give up valuable rights upon entering into an arrangement made only for convenience of administration. If, therefore, the supplemental agreement will not bear the interpretation which the Government's Director of Terminations placed upon it, the plaintiff is entitled to have it reformed to express what was clearly the intent of the parties. Since the same result follows whether we interpret the contract according to the intent of the parties, or reform it to express that intent, we do not explore the question further.

The plaintiff's other contracts, Nos. 828 and 1523, performable at the Nebraska plant, were terminated, and the St. Louis District made settlement satisfactory to the plaintiff. As we have said, a part of the starting costs incurred at the New Jersey plant in the preparation for performance of Contract No. 1932 were attributed by the Government to the Nebraska contract, No. 828, and the plaintiff was paid $64,582.57 on that account in the settlement of that contract. The Government raises the question whether if the plaintiff were to be paid what it claims to be the balance of its starting costs at the New Jersey plant, that would be a double payment. It would seem that it would not be, but that question will be resolved by the evidence to be taken as to the amount of the recovery.

The Government questions the accuracy of the account prepared by its auditors, hence further proceedings must be had before a commissioner of this court as to the amount to which the plaintiff is entitled. Our present determination is only that the Government is liable to the plaintiff.

It is so ordered.

JONES, Chief Judge, and HOWELL, WHITAKER and LITTLETON, Judges, concur.